Filed 9/2/15  P. v. Risenhoover CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL RISENHOOVER,<br><br>    Defendant and Appellant. | F067456<br><br>(Super. Ct. No. VCF269969)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Gerald F. Sevier and H. N. Papadakis,* Judges.†

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*Retired Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

†Judge Sevier presided over defendant's jury trial.  Judge Papadakis denied defendant's motion for a new trial and sentenced him.

**INTRODUCTION**

At the conclusion of a jury trial on October 31, 2012, defendant Michael Risenhoover was convicted of 10 counts of sexual abuse against his daughter, who was between the ages of eight and 13 when the abuse occurred. Defendant was sentenced to a prison term of 88 years to life. On appeal, defendant contends the trial court erred in denying expert testimony from a defense psychiatrist that the victim suffered from a psychiatric disorder that would explain her complaints of sexual abuse as a false report because she suffered from psychosis and delusion. Defendant further contends the trial court erred in permitting evidence of defendant's sexual conduct with his wife. We affirm the judgment.

**FACTS AND PROCEEDINGS**

*Allegations and Sentence*

Defendant was charged in a first amended information with, and convicted of, two counts of sexual intercourse or sodomy of a child 10 years of age or younger (Pen. Code, § 288.7, subd. (a), counts 1 & 2),[1] six counts of committing a lewd act on a child under the age of 14 years (§ 288, subd. (a), counts 3–8), and two counts of a forcible lewd act on a child under the age of 14 years (§ 288, subd. (b)(1), counts 9 & 10). It was further alleged as to counts 5 through 10, and the jury found true, the special allegation that defendant had substantial sexual conduct with the victim. (§ 1203.066, subd. (a)(8)).

Defendant was sentenced to consecutive terms of 25 years to life on counts 1 and 2 for an indeterminate sentence of 50 years to life. The court sentenced defendant to consecutive terms of 10 years on counts 9 and 10. Defendant was sentenced on count 3 to a consecutive upper term of eight years and to consecutive terms of two years, or one-third the midterm, on counts 4 through 8. Defendant's total determinate prison sentence is 38 years. The court imposed a restitution fine of $10,000 and granted actual custody credits of 276 days, conduct credits of 41 days, and total custody credits of 317 days.

---

[1]Unless otherwise designated, all statutory designations are to the Penal Code.

2.

*Victim's Testimony*

The victim was born in February 1999 and was 13 at the time of trial. She testified defendant started molesting her when she was six years old by taking showers with her and washing her body. Things got worse as she got older. Defendant would try to take her clothes off when she was eight years old. The first time defendant did this, he stopped because his wife, the victim's mother, was coming up the stairs. When the victim was eight or nine, defendant would touch her private with his hand.[2] This happened more than one time but it did not happen a lot.

The victim explained that each year defendant would try to do more to her. When she was 10 years old, defendant tried more than one time to put his private into her private and he would usually fail but defendant would touch his private with her private. The first time defendant did this was upstairs in his room. The victim's mother and siblings were downstairs at the time. Defendant would work a 12-hour shift and sleep while the rest of the family was awake. He would ask for water, and when the victim would bring him the water, defendant would ask her to get into bed with him.

The victim felt uncomfortable because she knew what would happen. She was 10 and 11 years old. Defendant would unbutton her pants and pull them down. Defendant would sometimes sleep in his boxers, but normally slept with no clothes on.

Once the victim's pants were off, defendant would move his hand around her private area, roll on top of her, and try to put his private inside of her. Defendant's private would be touching her private, and when this happened the victim described defendant's private part as hard. This happened more than once when the victim was 10 years old and when she was 11 years old. During these encounters, she would tell defendant he was hurting her and ask him to stop. Defendant would reply she was "doing good" and they were "almost there." The victim later testified defendant tried to put his private into hers during the summer she was eight years old. She remembered it hurt.

---

[2]The victim referred to drawings depicting human anatomy to describe and circle what she meant by each person's "privates." These were admitted as People's exhibits 1 and 2.

Defendant told her he would stop when summer was over. This happened twice to the victim that summer.

The victim testified when she was between 12 and a half to 13 years old, defendant succeeded in getting inside of her. She complied with defendant's request not to tell anyone what happened. The encounters would happen at different times of the day depending on defendant's work shift. After Christmas 2011, the victim was 12 years old. Before her 13th birthday, defendant told the victim to touch his penis, and he placed her hand in his private area. She refused and pulled her hand down. Defendant told her not to be so grumpy. Almost every day after that Christmas, defendant would try to stick his penis inside of her private area. Defendant would touch her chest and private area.

The victim realized after she started having her period that defendant "would back off and not do anything" to her. She would use fake blood on a pad and put it in her underwear to make her period appear to last longer. On one occasion when defendant unexpectedly came home, she threw the container of fake blood under her bed with the cap off and it leaked on the carpet.

The victim explained alcohol was involved in many of these incidents and her father drank a lot. The victim had a boyfriend to whom she sent text messages and talked with on her cell phone. Defendant told her not to say she loved the boyfriend or to call him pet names, and he would get mad at the victim for doing so.

One night the victim was in the living room with her brother watching television when defendant came in. Defendant had been drinking. He was wearing a T-shirt and swim shorts and was sweaty. Defendant sat in a chair, grabbed the victim by her hand, and told her to sit in his lap; she complied. Defendant asked the victim where she had her phone. The victim was very jittery. Defendant got up, pulled the victim by her arm, and led her towards her bedroom. By the laundry closet in the hallway he grabbed the victim's hips. Defendant pulled her close to him and told her how bad his life was because he had been in foster care. Defendant told the victim foster care was the worst

4.

thing ever, it ruined his life, and if she told anyone what was happening between them, it would ruin her life, his life, her mother's life, and the family's life.

Defendant grabbed the victim, opened the door to the weight room, and hit her leg on the weight bench. Defendant got her phone and read her text messages. Defendant and the victim went into her bedroom. Defendant then turned on her television, put the victim on her knees with her elbows on the ground, and tried to put his private into hers. She could feel defendant's private touching her skin and she felt pain. Defendant told the victim she was "doing good" and they were "almost there." The victim was crying and telling defendant to stop because he was hurting her. She could never forget this incident because it was the worst time defendant had ever hurt her.

Before defendant was finished with the victim, he put her in the doorway, took pictures with his cell phone, and told her he was going to upload the pictures to a private profile. She asked defendant why he would do that because her mother might see the pictures. Defendant told the victim that if her mother saw the pictures, the victim and her siblings would all go to foster care. Defendant said he was using a password only he knew for his private profile. The victim was not wearing clothes when defendant took her picture and she was still on her hands and knees. The picture did not show the victim's face. Defendant came back a few minutes later and showed her the pictures were deleted off his phone.

The victim described one more incident that occurred the night before Dr. Seuss Day in March. She was then 13 years old. She was in her bedroom watching television with two of her siblings eating Cocoa Puffs and peanut butter. She wanted her siblings in the room, thinking defendant would not do anything to her while they were present. Defendant walked into the room, which was unusual because the other siblings were there.

Defendant told the siblings to leave the victim's bedroom and to watch television in another room. Defendant took the victim's cell phone and looked through her messages. Defendant pulled the blankets off the victim's bed, put her on her back, took

5.

off her pants and her shorts, and pulled down his pants and shorts. Defendant then put his private into her private. Defendant told the victim she was "doing good." The victim pushed defendant off of her and told him to stop. One of her siblings was trying to reenter the room. Defendant pulled his pants up and told the sibling to leave.

At Christmas time, and one time after Christmas, defendant pulled a white bottle with a green lid out of his shorts pocket that was labeled "Up and Up." Defendant placed the contents of the bottle on his private prior to having intercourse with the victim. She explained that on one occasion after Christmas, defendant ejaculated on her chest and rubbed it in with her shirt. The victim described the above incidents as the "two main events" she could remember because defendant got farther than other times when he had tried unsuccessfully to stick his private into her private.

The victim did not believe her mother or siblings ever saw anything. When incidents happened at night, her mother was soundly asleep.

The victim had an imaginary friend she called Evanescence. She explained Evanescence was "this thing that I would handle my feelings with." Evanescence first showed up when the victim was six or seven and would tell the victim good things, that she was going to be okay, and nothing bad was going to happen. The victim was now aware Evanescence was not a real person, but thought Evanescence was real when she was between six and 10 years old.

The victim explained she wrote an essay for school describing Evanescence as a hero who had been molested by her father and physically hurt and abused by her friends. Evanescence kept a smile on her face. She helped and cared for others. When the victim was younger, she would see Evanescence at school and at home. The victim talked to Evanescence and they would play together. Sometimes the victim would see Evanescence and sometimes she would not. When the victim was 10 years old, she would see Evanescence more than when she was younger. Evanescence made the victim feel better. On cross-examination, the victim said she saw and talked to Evanescence more as she got older. Evanescence would tell the victim good things.

There were many years the victim told no one what was happening to her because she was told not to. When the victim was younger, between the ages of six to nine, she did not tell anyone what was happening because she knew it was wrong "but not bad." When the victim was 10 years old, defendant's actions started to hurt her a lot and he was putting her through pain. She then realized he was not supposed to do that. The victim was also afraid of foster care because of the lies defendant told her about it. Defendant told the victim many times the abuse was going to stop, but it never did.

The victim finally told a friend about the abuse in 2012 to put a stop to it. The friend told the victim to tell someone about the abuse and explained she had been in foster care and it was actually fun.

The victim later told other friends what was happening to her. Her friends made the victim "pinky promise" she would tell someone the next time she was abused. But one of the friends told her mother about the abuse. The mother had a friend who worked at the school. The next day the school employee reported the abuse to school administrators. The victim talked to the police the same day and was placed in a foster home.

The victim was asked about the time she got her tongue pierced without her parents' permission. An adult at school noticed the piercing and called the victim's parents. The victim took the ring out of her tongue as soon as she got home. When confronted by her parents, the victim denied piercing her tongue, but her mother noticed two of her needles were missing. When the victim stuck her tongue out, defendant grabbed it, felt it, and noticed a knot on her tongue. Defendant took away the victim's 13th birthday party, her cheerleading, and her cell phone. The victim was not angry but sad. Her parents also tried to make her break up with her boyfriend.

The victim had not initially told investigators the whole story because she had been afraid of foster care and losing everything. She decided to tell the truth about what happened because once she was in foster care she had lost everything, and lying did not get her anywhere. The victim said all her testimony was the truth. When she was

brought into the school office by an administrator, the victim was asked if her father had done bad things to her. The victim initially said it was a lie because she did not want to go into foster care.

The day the victim was contacted by investigators, she initially told Detective Katherine Garcia of the Tulare County Sheriff's Department that her father always touched her over her clothing. She told a woman at the school the molestation by defendant was a lie because she did not want to be separated from her siblings in foster care and she thought she would be sent back home. For the same reason, the victim did not tell Garcia everything that had happened to her the day she was placed in foster care.

After the molestation was reported, the victim's parents gave her back her phone. Defendant wanted the victim to form a secret alliance with him. Defendant sent her a text at school and then they talked. Defendant wanted the victim to tell investigators she had lied about everything because she was mad at defendant for canceling her birthday party after she pierced her tongue. Defendant said the only way they could be back together as a family was for the victim to tell investigators her story was a lie because she was mad at her father for cancelling her birthday party. The victim never told investigators her story was a lie. She did, however, tell her parents she had recanted her story to investigators.

At first, the victim did not want to undergo a sexual assault examination. She changed her mind when she realized the truth might as well come out. When the victim was asked if she was at all confused about what had happened to her versus what had happened to Evanescence, the victim replied, "No." She reiterated that everything she testified to happened to her and she did not lie because her birthday party was taken away.

### Law Enforcement Investigation

Deputy Cindy Anderson with the Tulare County Sheriff's Department met the victim at school on March 6, 2012. At first the victim was defensive of her father. Anderson briefly stepped away from the victim and talked to a classmate to get more

information.  When Anderson stepped back in, she told the victim she had talked to a classmate who had reported the incident to her parent.  The victim then broke down and started to shake and cry.

Detective Garcia also spoke with the victim on March 6, 2012.  Garcia described the victim's demeanor that day as scared.  She was crying and did not want to talk to Garcia.  She initially gave Garcia very little information.  It took multiple questioning sessions before the victim divulged any information.  Garcia talked to the victim two more times in 10-minute sessions that day.  Garcia described the victim as being more at ease.  She provided more information.  Garcia also observed the interview of the child abuse response team, which did not occur until May 10, 2012.  During this interview, the victim was much calmer than she had been at school.

On May 15, 2012, Garcia executed a search warrant to search defendant's vehicle.  Garcia found a copy of the report of this investigation in defendant's car as well as a black iPhone sitting on the center of the dashboard.  The phone looked as though it had been hit with a hammer.  Defendant admitted the phone was his.  There was also a fiberglass torso, from the neck to the thighs, of a nude woman wearing a T-shirt.

The recovered phone did not contain any usable data other than the operating system.  The drive was physically "wiped" of all other information.  A phone can be wiped by using a program or by resetting the phone.  Resetting the phone can be accomplished remotely, a feature used if the phone is stolen or lost.  When this procedure is used, the memory on the phone is wiped as soon as the phone ties into the carrier's network.  The physical damage to the phone, though substantial, could not have wiped out the phone's data.  The phone was still working.

During a search of defendant's home, investigators found a sealed package of fake blood in a box of Halloween supplies in the garage.  There was a pink bedroom with an old mattress and two red stains on the carpet below the mattress.  Photographs of the carpet and the portion of the carpet with the stain were taken from the bedroom and admitted into evidence.

*Other Prosecution Witnesses*

T.S. is the victim's classmate and friend. T.S. said that in October 2011, the victim told her defendant was "doing stuff to her." The victim mentioned it again about a month later. She did not talk about it again to T.S. When she first told T.S. about what was happening to her, the victim was upset and crying. M.G. was also the victim's classmate and best friend. At the beginning of a school year, the victim told M.G. that something was going on between her and her father. At first, the victim would not give any details. Later she told M.G. "all the details." M.G. asked her own mother what to do. M.G.'s mother told M.G. to report what she heard to the school office. M.G. did so and also talked to investigators.

M.G. explained the victim told her she got into trouble for piercing her tongue and was told she could not have her birthday party. Although the victim was mad, she told M.G. it was her own fault for piercing her tongue. M.G. had never seen the victim talking to someone who was not there. The victim had scars, and she told M.G. they were from cutting herself.

Geraldo Calderon worked with defendant and knew him for about five years. Defendant told Calderon he had sex with his wife almost every day unless she was on her menstrual cycle; then sex was taboo. Mark Grove worked with defendant for eight years. Defendant told Grove he had sex with his wife almost every day. Defendant also told Grove on one occasion when defendant's wife did not want to have sex with him, he waited for her to fall asleep and masturbated in her hair.

Defendant also worked with Marcel Campos. Defendant told Campos his wife did not have large breasts, and when she got breast implants, she became a B cup. Defendant said he liked the way his wife was when she was more flat chested because it reminded defendant "of a little girl."

*Defendant's Wife*

Defendant's wife (wife) testified as a prosecution witness that her daughter had a room in the upstairs of their house when they first moved into it. Later, she had a room

downstairs. Wife first learned of the molestation allegations from a relative who worked at the victim's school. Wife described herself as a deep sleeper. Wife had sex with defendant nearly every day. They did not have sex during wife's period because they agreed it was "disgusting."

Wife was also called as a witness for the defense. Wife received a call in February 2012 from one of the victim's teachers informing wife the victim had pierced her tongue. When the victim came home, wife demanded she give up her phone. The victim lied about piercing her tongue at first, then broke down crying and admitted she had attempted to pierce her tongue. Wife told the victim she would not have her birthday party and she was grounded. The victim was upset. The victim cried and told her mother it was not fair. Wife said the victim believed their house was haunted.

Wife did not learn about Evanescence until the night the victim was taken away. Wife explained that three or four years earlier she had heard the victim in her room talking. Wife thought the victim was on the phone, but when she entered the room, the victim was not talking to anyone on the phone. Wife thought the family "probably" knew wife did not have sex with defendant during her period. Wife thought the family was aware of this because she would openly joke about being on her period. Wife explained, however, that she and defendant did not announce to the children they were having sex or she was having her period.

Wife said that there was fake blood in her home because there had been a Halloween zombie party in 2011. Everyone had fake blood for their costumes. The victim had fake blood on her and on her dress. It would not surprise wife if fake blood had been spilled on the carpet in the house. Wife said there were two or three fake blood stains in the victim's room. Wife was unaware, however, there was a fake blood stain underneath the victim's bed. Wife said defendant only drank once or twice a month. Wife explained defendant had a normal size penis.

11.

***People's Expert Testimony***

In March 2012, Kathy Boyle worked as a pediatric nurse practitioner for Valley Children's Hospital in Madera in the Child Advocacy Center. Boyle examined children with a history or suspected history of child maltreatment. Boyle is both a registered nurse and a certified nurse practitioner with Associate of Arts, Bachelor of Arts, and Master's degrees in nursing. Boyle has a further certification by the International Forensic Nurses Association as a sexual assault forensic nurse examiner. Boyle had conducted approximately 8,600 sexual assault examinations of children and adolescents over the course of her career.

Boyle was part of the victim's sexual assault response team (SART) assigned to investigate an alleged sexual assault and to collect evidence. The victim was physically examined on March 29, 2012. The structures of her genitalia were normal, including her labia, clitoral hood, and labia minora. The victim's hymen was well estrogenized with normal scalloping. There were no obvious clefts or injuries.

Boyle explained that during SART examinations, about 20 percent of children have some type of physical finding and 80 percent have normal examinations. The medical literature documents that 95 percent of children who are suspected victims of sexual assault have normal examinations. Often, where there were injuries, they are so well healed the examination appears to be normal. In prepubescent girls, the hymen is like a rubber band that can stretch before it breaks or tears.

If the hymen were torn a year prior to Boyle examining the patient, and contact with the same size object continued, the hymen would accommodate the size of that object. Boyle may not see anything unusual a year after such an incident because a normal, well-estrogenized hymen has a very irregular edge called scalloping. An earlier tear could heal and indication of the tear would be lost in the scalloping irregularities of the hymen. Boyle would not be able to differentiate between a healed tear and normal scalloping.

The medical literature supports the fact children often disclose abuse well after the time when a medical examination will reveal an acute injury, redness, bleeding, or tears and lacerations. Some children never suffer physical injuries. This could be due to the use of lubricants or from activity not causing physical trauma. The genital area—both the vagina and the anus—is very elastic and can expand without tearing, so some children never have injuries. The victim's account of how defendant abused her was consistent with the physical findings of her SART examination.

The jury was shown a photograph of the victim's hymen taken during the SART examination. Analyzing the photograph, Boyle stated one region showed possible tearing that healed but was difficult to recognize as tearing. Due to both the stretching and healing abilities of the hymen, Boyle explained it was possible for there to have been penetration of the victim's vagina and for her to present a normal examination. Healing could occur as soon as 72 hours, but not later than five days. Repeated sexual intercourse with the same person does not necessarily cause more injury just because it happens often.

Dr. Anthony Urquiza, a licensed psychologist, a professor in the Department of Pediatrics at the University of California, Davis Medical Center in Sacramento, and director of Care Center, a child sexual abuse treatment program with the pediatric program, testified as an expert on child abuse accommodation syndrome (CSAAS). Dr. Urquiza testified he knew nothing about this case and had no opinion about whether the victim had been abused. Further, it was not his place to have such an opinion without meeting and testing the patient.

Dr. Urquiza explained that in 1983, Dr. Roland Summit, a psychiatrist affiliated with the University of California, Los Angeles, published an article about CSAAS and tried to explain the kinds of misunderstandings people had about sexual abuse. The article described common characteristics and behaviors that might not easily be understood by therapists. Dr. Urquiza described CSAAS as an educational tool designed to educate therapists about sexual abuse. There are five parts to CSAAS. The first is

13.

secrecy.  The second is helplessness.  The third part has two components, entrapment and accommodation.  The fourth part is delayed and unconvincing disclosure.  The last part is retraction.

Dr. Urquiza explained that most children are sexually abused by someone they know and who is stronger, or who is in a position of authority or control over the child's life.  Although most people think the first thing children will do after being molested is to tell their parents, this is a myth because children usually keep it a secret.  Children will keep the secret because they are physically threatened, or a pet is physically threatened.  Children are also intimidated by someone who is bigger and stronger.

Other times there is an on-going relationship between the child and the perpetrator.  The child may enjoy being with the perpetrator or the perpetrator may give the child gifts or special attention.  If the child loves the perpetrator, there can be problems if the abuse is disclosed, such as the child going into foster care.

Most children subject to abuse do not yell, fight, or try to run away from the perpetrator.  Children who are abused try to accommodate, or cope, with being abused.  A common response by a victim is to disassociate by disengaging from a current sense of reality.  Although it sounds strange, it is common.  Children do this to escape feelings of shame, humiliation, and disgust.

When asked if a hypothetical victim 13 years old who had an imaginary friend from the time she was six or seven years old fit within the accommodation syndrome, Dr. Urquiza first noted it was common for younger children who had not been abused to have imaginary friends.  Dr. Urquiza explained imaginary friends are common in children between the ages of four and six years.  A child with such a friend "would be potentially a child who might be, you know, not schizophrenic but psychotic."  In the early age range there are not schizophrenic children.  This condition does not occur until children are in their late teens.  Schizophrenia is easy to determine because patients are delusional, hear voices, see things that do not exist, and hear people talking who are not present.  It also takes a great deal of effort to have a conversation with schizophrenic patients.

14.

Having an imaginary friend could also be a means to cope with the experience of being abused. Dr. Urquiza explained it is difficult for people who have not been abused to understand the significance of thoughts and feelings a victim of sexual abuse may have. One way for a victim to manage and cope with those feelings would be to create an imaginary friend to talk to about feelings because victims often feel they cannot talk to anyone about their experience. The prosecutor asked Dr. Urquiza if there was a possible psychotic diagnosis, would it be readily apparent in conversation with the person. He replied psychotic children are incredibly rare and one would be able to tell within a few minutes after an encounter by talking to him or her. Such patients answer questions posed to them with information unrelated to the question.

Returning to CSAAS, Dr. Urquiza explained research from some 15 studies showed disclosure of abuse by victims is usually delayed. Twelve months after abuse, about three quarters of victims had failed to tell anyone they were abused. Dr. Summit's article also explained the process of disclosure often leaks out over time. Thus, the first account may have less information than subsequent accounts. Family pressure can lead to a retraction of an allegation by a victim.

Dr. Urquiza reiterated that Dr. Summit wrote his article to educate therapists, not to propose that if there were four of the five categories present, for instance, the reporter was abused, or if there were fewer than three categories present it could be concluded there was no abuse. This would be an improper use of Dr. Summit's research. Dr. Urquiza concluded Dr. Summit's research is useful to educate therapists and jurors about sexual abuse "so that when they hear evidence in a case, they can render [an] opinion based upon the facts of the case that's been presented to them, not about any misperceptions they may have about sexual abuse." Also, there is no diagnostic tool in mental health literature to definitely diagnose and distinguish a true allegation from a false allegation of child abuse.

*Defense Expert testimony*

The trial court conducted an Evidence Code section 402 hearing prior to the testimony of Howard Terrell, M.D. The court noted earlier testimony maintaining it was not uncommon for children to have an imaginary friend until about age six or so, and, therefore, it would be appropriate for Dr. Terrell to testify about that psychological development. The court ruled Dr. Terrell could not give his opinion the victim was suffering from some kind of disorder because he had not examined her and this information would not assist the trier of fact.

The trial court further ruled Dr. Terrell could not render any opinions concerning the victim's diagnosis of suffering from bipolar disorder or any other kind of psychiatric disorder. The court found any discussion of the victim being bipolar was based on hearsay, some of it double hearsay, on unreliable sources, and it was not sufficiently trustworthy to form the basis of an expert opinion.

Dr. Terrell testified to the jury he was an Assistant Clinical Professor of Psychiatry with the University of California San Francisco School of Medicine in Fresno. Dr. Terrell treated hundreds of victims of sexual abuse and testified as an expert for both the prosecution and defense. Dr. Terrell has reviewed CSAAS studies, has published and taught on this issue, and has met with Dr. Summit. Dr. Terrell explained Dr. Summit's work has little value in differentiating true from false accusations of abuse. Dr. Summit's work with CSAAS does have value to teach treating clinicians or other mental health professionals to understand the dynamics of the mind of a sexually abused child.

Dr. Terrell explained Dr. Summit works from the premise that one is nearly always dealing with a child who has been abused. Dr. Summit has estimated false accusations occur in two or three cases out of a thousand whereas the literature supports a number between 2 and 10 percent, with a higher likelihood of false accusations from older children. Dr. Terrell agreed with Dr. Urquiza that CSAAS was not a tool to use to determine true from false allegations.

16.

Dr. Terrell reviewed the victim's SART examination and photographs of her hymen. Dr. Terrell explained when a teenaged female engages in sexual intercourse with a male who has a normal size penis, one would expect very significant ripping, tearing, lacerations, and damage, especially to the lower hymen. There would normally be scarring even if the damage heals. One would further expect very little of the lower portion of the hymen to be left after 10 to 15 episodes of sexual intercourse.

Dr. Terrell concluded based on his training and experience that the victim's hymen did not resemble that of a girl 12 or 13 years old who had intercourse multiple times. Dr. Terrell maintained this conclusion even assuming the hymen had healed. Dr. Terrell concluded that had the victim engaged in intercourse two or three times a week for over a year, it would be impossible for her to have an intact hymen.

### Defendant's Testimony

Defendant testified he had never done anything inappropriate with his daughter and had never molested her. The victim had been seeing ghosts that were not there and going on ghost hunts with her cousins. Defendant saw the victim on multiple occasions talking to and arguing with herself. Defendant did not realize "she was going out of her mind." When the victim's cell phone, birthday party, and cheerleading activities were taken from her after she pierced her tongue, her personality toward defendant changed immediately from loving and considerate to holding a grudge against him.

When defendant was arrested, he was told the investigation and report concerning the allegations would be blocked. Defendant kept checking the computer at work to make sure others did not have access to the investigation against him. On one occasion, defendant was able to open up the entire report so he notified a commanding officer and was later told it could not be blocked because it was public information. Once defendant learned this, he printed out the report.

While defendant was shopping with his wife, he noticed his cell phone was missing. He subsequently found it in the parking lot where he had dropped it, and it was broken. All the information on the phone was also lost. Defendant denied telling a

coworker he was angry with his wife and masturbated into her hair but instead had described mutual sex acts that occurred with his wife's consent. Defendant explained he spent a tax refund for his wife to get breast implants and they both wanted her to do so.

On cross-examination, defendant acknowledged he looked on the computer system several times every day to make sure the investigation report was not accessible.

## DISCUSSION

### I. Defendant's Assertion He Was Denied His Right to Present a Defense

Defendant contends the trial court denied his due process right to present a defense by not permitting Dr. Terrell to testify concerning the psychological makeup of the victim and her perception of reality. Defendant argues this testimony was relevant to the victim's veracity. Defendant maintains the trial court did not allow expert testimony the victim was suffering from some kind of disorder because as an adolescent she still had an imaginary friend.

We find much of the expert testimony the defense sought to introduce lacked an adequate foundation to be admitted. We also find the trial court did not exclude the admissible portion of Dr. Terrell's testimony. We finally hold that even if the trial court's ruling could be interpreted to exclude the admissible portion of Dr. Terrell's testimony, any error was harmless beyond a reasonable doubt.

*Evidence Code Section 402 Hearing*

Dr. Terrell was called to testify as the defense expert on CSAAS and whether the victim had been subjected to penile penetration. The court conducted an Evidence Code section 402 hearing concerning an offer of proof by the defense that the victim was delusional because she had an imaginary friend, that she was being treated for a mental illness, and there was a likelihood she had made a false report of sexual abuse due to her mental illness.

The prosecutor made a motion that Dr. Terrell not be permitted to testify concerning any indicators of whether the victim made a false report. Defense counsel replied Dr. Terrell's testimony would not be whether the victim actually filed a false

18.

report, but what the factors would be in making a false report. The prosecutor conducted a voir dire of Dr. Terrell on this point.

Dr. Terrell was asked about an article he wrote concerning the making of a false report. Dr. Terrell explained his article was not an empirical study of actual cases of alleged false reporting, but a review of the literature concerning such reports. Dr. Terrell referred to a sexual abuse indicator (SAI) scale, but acknowledged it was not generally used by law enforcement or the medical community. Dr. Terrell stated there were factors to consider to determine the difference between the 95 percent of cases that were true from the 5 percent of cases that were false reports. Dr. Terrell explained that although this test did not meet *Kelly-Frye*[3] standards, it was "ideal" for physicians, psychiatrists, psychologists, and police to look at factors such as whether the reporter's history was consistent and whether the history was consistent with the physical examination findings.

The trial court noted under Evidence Code section 805, Dr. Terrell could not express an opinion concerning the defendant's guilt or innocence. The court ruled, however, Dr. Terrell was qualified to opine on the ultimate issue of whether there was full penile penetration of the victim as well as CSAAS. The court explained it would disallow any mention of SAI. Defense counsel explained that although SAI was not commonly accepted under *Kelly-Frye*, it was not the defense's intention to proffer the testimony for that purpose.

Defense counsel stated Dr. Terrell would testify about the victim's bipolar symptoms based on her testimony of having seen people who did not exist. The court observed Dr. Urquiza had testified it would be irresponsible for him to give any kind of diagnosis without an examination of the patient. Defense counsel said the defense was not seeking to present Dr. Terrell's diagnosis, but his expert opinion as a psychiatrist to explain the meaning of the victim's specific symptoms.

_____

[3] *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. U.S.* (D.C. Cir. 1923) 54 App.D.C. 46 [293 Fed. 1013].

The prosecutor objected to this line of questioning because Dr. Terrell did not have the victim's medical records, the only evidence at this point was her testimony concerning Evanescence, and it would be inappropriate for Dr. Terrell to testify concerning symptoms indicative of a mental illness because the jury would be placed in the position of determining whether she suffered from a medical illness.

Defense counsel argued Dr. Terrell should be permitted to testify concerning what counsel described as the real person the victim actually sees and to give a psychiatric interpretation of what this means. The trial court responded the victim did not testify she still saw Evanescence and she had explained she understood Evanescence was not real. Defense counsel replied defendant should be allowed to contradict the prosecution's evidence showing Evanescence was caused by sexual abuse and was a coping mechanism with testimony that it could be a fabrication the victim may not even realize. Defense counsel argued the victim's imaginary friend, someone who does not exist, along with the victim's flashbacks of past molestation, are indications the victim experienced things that did not happen.

Dr. Terrell elaborated the victim made accusations of multiple rapes that do not match the physical examination of the SART team. Dr. Terrell stated the victim had a history of a psychotic mental disorder based on wife's conversation with a nurse. Dr. Terrell believed the victim had a bipolar disorder based on a medication her doctor had prescribed based on information he had from the victim's physician. Dr. Terrell further explained such patients have delusions, unshakable thoughts of things they truly believe to be factual, which, in fact did not occur. Dr. Terrell offered he would accept the diagnosis of the victim's physician and base his opinion on a particular medication she was prescribed.

The court noted earlier testimony maintaining it was not uncommon for children to have an imaginary friend until about age six or so, and, therefore, it would be appropriate for Dr. Terrell to testify about that psychological development. The court ruled Dr. Terrell could not give his opinion the victim was suffering from some kind of

20.

disorder because he had not examined her and this information would not assist the trier of fact.

The trial court further ruled Dr. Terrell could not render any opinions concerning a diagnosis the victim suffered from bipolar disorder or any other kind of psychiatric disorder. The court found any discussion of the victim being bipolar was based on hearsay, some of it double hearsay, was based on unreliable sources, and was not sufficiently trustworthy to form the basis of an expert opinion.

*Analysis*

During the Evidence Code section 402 hearing, Dr. Terrell explained he wanted to talk about SAI, even though he acknowledged it did not meet the standard for scientific evidence set forth in *Kelly-Frye*. Dr. Terrell and defense counsel both stated Dr. Terrell would not specifically testify the victim made a false report or give a diagnosis of her, but Dr. Terrell would set forth his expert opinion as a psychiatrist to explain the meaning of the victim's specific symptoms. Although Dr. Terrell and defense counsel said they would accept the diagnosis of the victim's physician, Dr. Terrell was going to rely on the victim's unsubstantiated medical records and medications he thought she was being prescribed.

Also, Dr. Terrell planned to proffer his opinion of her mental status based on the medication he believed she had been prescribed. The trial court identified a key problem with the testimony proffered by the defense through Dr. Terrell's testimony was that his opinions concerning the victim were speculative. There was no offer by the defense to set a foundation for Dr. Terrell's specific opinion concerning the victim's psychological state based on her medical records. The victim's medical records were not authenticated or verified as accurate.

The Legislature enacted section 1112, which states a court shall not order any prosecuting or other witness, or the victim of a sexual assault, to submit to psychiatric or psychological examination for the purpose of assessing his or her credibility. (*People v. Cooks* (1983) 141 Cal.App.3d 224, 302-303, fn. 61.) The use of psychiatric testimony to

impeach a witness is generally disfavored. (*People v. Anderson* (2001) 25 Cal.4th 543, 575; *People v. Marshall* (1996) 13 Cal.4th 799, 835.) It is not an abuse of discretion by the trial court to limit testimony of mental health experts on the credibility of witness statements because a psychiatrist or other mental health expert may not be in a better position to evaluate witness credibility than the jury. (*People v. McDowell* (2012) 54 Cal.4th 395, 426-427.)

Generally, an expert may render opinion testimony on the basis of facts shown by evidence that asks the expert to assume their truth. The hypothetical question must be rooted, however, in facts shown by the evidence. (*People v. Richardson* (2008) 43 Cal.4th 959, 1008.) Although an expert may rely on inadmissible evidence, a trial court may exclude opinion testimony based on incompetent hearsay. (*People v. Gardeley* (1996) 14 Cal.4th 605, 618-619.) An expert opinion requires a proper foundation. (See *People v. Hayes* (1985) 172 Cal.App.3d 517, 524-525.)

In determining the admissibility of evidence, the trial court has broad discretion. A trial court's decision on the admissibility of expert testimony is reviewed on appeal for abuse of discretion. (*People v. Lucas* (2014) 60 Cal.4th 153, 226, disapproved on other grounds in *People v. Romero and Self* (Aug. 27, 2015, S055856) __ Cal.4th __, __, fn. 19 [2015 Cal.LEXIS 5759].) A trial court can therefore reasonably determine the expert's testimony lacks the necessary foundation to be relevant and may exclude the expert's opinion testimony if the expert lacks an adequate basis in formulating it. (*Id.* at pp. 226-227.)

An expert's opinion cannot be based on assumptions of fact without evidentiary support or on factors that are speculative or conjectural. A court can exclude a hypothetical question calling for an opinion without an adequate foundation. When the proposed expert testimony rests on an assumption without any support in the trial evidence, a trial court abuses its discretion in admitting it. Such testimony has little or no probative value, bears the potential to mislead the jury into accepting the unsupported assumption and drawing unwarranted conclusions from it, and thus cannot significantly

help the trier of fact to evaluate the issues it must decide. (*People v. Moore* (2011) 51 Cal.4th 386, 405-406; *People v. Richardson*, *supra*, 43 Cal.4th at p. 1008.)

The defense strategy was to have Dr. Terrell testify as an expert to use the victim's medical records in the guise of expert testimony to prove a specific medical condition that would call into question the veracity of her report of abuse. The trial court accurately noted Dr. Terrell had not examined the victim. There was also no offer of proof concerning the accuracy of the victim's medical records. The defense failed to lay a proper foundation for the very broad scope of Dr. Terrell's proposed expert testimony.

Dr. Terrell could have been asked hypothetically, based on the victim's testimony, whether having an imaginary friend at age 13 could be a sign of a disorder. This would have been within the realm of proper expert testimony and would not have been subject to the lack of foundation discussed above. The trial court did not preclude this line of questioning because it specifically noted earlier testimony maintained it was not uncommon for children to have an imaginary friend until about age six or so, and it would be appropriate for Dr. Terrell to testify about that psychological development. Defense counsel did not question Dr. Terrell on this point even though the trial court apparently would not have excluded such testimony. The defense was not foreclosed from asking Dr. Terrell his expert opinion concerning the continued existence of the victim's imaginary friend.

The scope of what the defense sought from Dr. Terrell's expert testimony was speculative and lacked proper evidentiary foundation. As we just noted, however, Dr. Terrell could have been asked hypothetically whether an adolescent 13 years old having an imaginary friend was a sign of a disorder. The colloquy between counsel and the trial court was long and the court's ruling was made at different junctures during the hearing. It is possible defense counsel could have misunderstood the trial court's ruling permitting a more limited questioning of Dr. Terrell and it is also possible to interpret the trial court's final ruling at the end of the hearing as foreclosing even a more limited line of questioning concerning the victim's imaginary friend.

23.

We therefore review the evidence adduced at trial to determine whether the absence of Dr. Terrell's testimony concerning the imaginary friend was prejudicial to the defense. Assuming arguendo the trial court erred in limiting Dr. Terrell's testimony concerning the psychological effect of the victim still having an imaginary friend when she was 12 and 13 years old, we find the failure to permit such testimony was harmless beyond a reasonable doubt pursuant to the standard of review set forth in *Chapman v. California* (1967) 386 U.S. 18.

Although no independent witness observed the victim being molested, there were many facts adduced at trial that corroborated her testimony. Defendant stayed away from sexual activity during his wife's menstruation, and did so with the victim as well. This was corroborated by wife, defendant, and defendant's coworker who testified defendant told him he did not have sex with wife during her menstruation.

Wife suggested her children were aware of this sexual practice in her marriage, but admitted she and defendant did not tell the victim, or any other of the children, about when she was menstruating or when the parents were having sexual relations. Wife's testimony failed to establish the victim knew her parents did not have sexual relations during wife's menstruation. Thus, there was no evidence to establish the victim received information from either of her parents from which she could fabricate the story that she used the fake blood as part of a false report of sexual abuse. If the jury found the victim's testimony credible, the only reasonable inference and conclusion it could draw was the victim learned from her own personal experience to extend her menstruation to keep her father from molesting her.

The victim also described that on one occasion when her father was coming into her room while she was apparently trying to use the fake blood, she panicked and threw the container under her bed causing a red stain on her pink carpet. Investigators found both fake blood in the family home and a red stain under the bed of the "pink" bedroom. Although wife testified there were fake blood stains in the victim's bedroom, she was unaware there was such a stain underneath the victim's bed. The stained portion of the

24.

pink carpet from the victim's bedroom was removed from the house by investigators and admitted into evidence.

Defendant was found in possession of the sheriff department's report of this investigation. Defendant's explanation for having the report in his possession was not convincing. There was evidence defendant sent text messages to the victim telling her to recant her report of sexual abuse. Defendant's cell phone was recovered from his car. The data was wiped from the phone, something that had to be done intentionally. The phone looked like it had been hit with a hammer. There was testimony that hitting the device with a hammer would not cause the phone to lose its data. Defendant's explanation of dropping his phone in a parking lot failed to explain the physical damage to the phone that appeared to be caused by a hammer, and that damage could not have deleted data from the phone.

Defendant's possession of the report of the investigation, coupled with defendant's communication to the victim to recant her testimony and the defendant's smashed cell phone wiped clean of data are all circumstances from which the trier of fact could reasonably find defendant was trying to hide information of, or impede, the investigation. A jury is entitled to infer a consciousness of guilt when a defendant suppresses evidence.[4] (*People v. Hart* (1999) 20 Cal.4th 546, 620.)

Defendant also told his coworkers details of his sex life with wife. Defendant would not have intercourse with wife during her period, a pattern he continued with the victim. Also, defendant told a coworker he was disappointed when wife received breast augmentation because prior to that she was flat chested and looked to defendant more like a little girl. Though circumstantial, all of this evidence indicates defendant had the desire and intent to sexually abuse his daughter.

---

[4]Although the jury did not receive an instruction concerning consciousness of guilt, the prosecutor argued in her closing statement to the jury that defendant was found with a copy of the police report, he apparently wiped his cell phone of data, and he asked the victim to recant her report of sexual abuse. The jury could, therefore, have drawn a reasonable inference from these facts that defendant was trying to learn about and to impede the investigation.

Dr. Urquiza testified having an imaginary friend could be a sign of psychosis, though this condition was rare in children. The jury, therefore, did have expert testimony before it that having an imaginary friend could be a sign of psychosis. Both parents testified the victim heard voices and she thought ghosts were real. In his closing argument to the jury, defense counsel argued the victim had trouble differentiating fantasy from reality as evidenced by Evanescence. Counsel submitted to the jury the victim should have realized Evanescence was not real after the age of eight but she still had the imaginary friend at 13. In rebuttal, the prosecutor argued the victim had suffered abuse from her father and pointed out the jury could evaluate the victim's demeanor, which was not delusional, from her testimony.

The victim took some time to report all that had happened to her. The first day of the investigation, she denied to one adult anything had happened to her in order to stay out of foster care. Thereafter, however, the victim did not give inconsistent accounts to investigators of the abuse she suffered. The victim's trial testimony was consistent. She testified over two days. The jury had the opportunity to weigh and assess her credibility, as well as her mental status. The victim explained in her testimony that when she was younger, she believed Evanescence was real but she did not currently believe this. The jury was not foreclosed from assessing whether the victim showed signs of mental instability.

The jury had an opportunity to assess and weigh the credibility of the testimony of the victim, her parents, and defendant's coworkers and decide whether the victim could have made up or fantasized the abuse and rejected it. We conclude that even though the jury did not hear Dr. Terrell's opinion testimony concerning Evanescence, the failure to allow this testimony was harmless beyond a reasonable doubt.

## II.    Evidence of Defendant's Sexual Conduct with His Wife

Defendant contends he was prejudiced by the trial court's ruling to allow testimony from his wife that they had sex almost every day, refraining from sex during her menstruation, as well as testimony from his coworker that defendant had masturbated

once into his wife's hair while she was asleep.  Prior to the coworker's testimony, the trial court granted the prosecutor's motion to introduce this evidence over the objection of defense counsel on Evidence Code section 352 grounds.

Defendant argues his legal sexual conduct with his wife was not relevant to any issue at trial.  Defendant contends it was error under Evidence Code section 352 to permit this testimony pursuant to Evidence Code section 1101, subdivision (b).  We find no error.

Evidence Code section 1101, subdivision (b) permits evidence of crime, civil wrong, or other acts when relevant to prove a fact such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether the defendant in a prosecution for an unlawful sexual act did not reasonably believe the victim consented.  Evidence Code section 352 grants the trial court discretion to exclude evidence if its probative value is substantially outweighed by the probability its admission will take undue consumption of time, or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

Evidence a defendant has committed offenses other than those currently alleged is not admissible to prove the defendant is a person of bad character or has a criminal disposition.  Such evidence is admissible to prove the identity of the perpetrator of the charged crimes, a common design or plan, or the perpetrator's intent.  The trial court's determination of this issue, which is essentially one of relevance, is reviewed on appeal for abuse of discretion.  (*People v. Carter* (2005) 36 Cal.4th 1114, 1147; *People v. Kipp* (1998) 18 Cal.4th 349, 369.)  The abuse of discretion standard of review is applied to the trial court's rulings under both Evidence Code sections 1101 and 352.  (*People v. Lewis* (2001) 25 Cal.4th 610, 637.)

Evidence of an uncharged crime admitted to prove intent requires the least degree of similarity between the uncharged and the charged offense and evidence admitted to prove identity requires the greatest degree.  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403.)  Although the conduct in question must be sufficiently similar, the evidence

27.

admissible to prove intent must only support the inference the defendant probably possessed the same intent in each instance.  (*Id.* at p. 402.)

The challenged evidence concerning wife's menstruation and the incident when defendant masturbated into wife's hair after she would not have sex with him was relevant to show defendant had a daily interest in sex.  It demonstrated a potential motive to find another sexual partner while wife was having her menstruation.  This evidence also explained and corroborated the victim's testimony that defendant would not have sex with her during her menstruation as well as her efforts to extend the appearance of her menstruation with fake blood to keep defendant away from her.

Evidence, for instance, that Charles Manson ordered a follower to conduct a lawful sexual act with an associate of his cult was found admissible under Evidence Code section 1101 to show Manson's leadership and direction of the cult.  (*People v. Manson* (1976) 61 Cal.App.3d 102, 130-131.)  Evidence defendant committed a sexual act on his wife while she was asleep demonstrated defendant harbored the intent to commit sexual acts without the consent of the other party, whether it was his wife or daughter, sought to dominate those with whom he had sex, and was proof of defendant's intent under Evidence Code section 1101, subdivision (b).  We note evidence is not unduly prejudicial merely because it strongly implicates the defendant or casts him or her in a bad light.  (*People v. Jones* (2012) 54 Cal.4th 1, 61-62.)

We also determine that even if the trial court erred in allowing evidence of defendant's sexual conduct with his wife, the error was harmless.  The application of rules of evidence such as Evidence Code section 352 does not normally implicate the federal Constitution, and any error is measured under the standard of review set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836.  (*People v. Marks* (2003) 31 Cal.4th 197, 226-227; *People v. Jandres* (2014) 226 Cal.App.4th 340, 357.)

**DISPOSITION**

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
DETJEN, Acting P.J.


_____
SMITH, J.